United States District Court
Southern District of Texas
**ENTERED**
May 31, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**



| | | |
|---|---|---|
| IN RE BOUCHARD TRANSPORTATION CO., INC., | § § § § § | |
| Debtor. | § § | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | § § § § | CIVIL ACTION NO. H-21-2844 BANKRUPTCY CASE NO. 20-34682 |
| Appellant, | § § | |
| VS. | § § | |
| BOUCHARD TRANSPORTATION CO., INC., and HARTREE PARTNERS, LP, | § § § § | |
| Appellees. | § § | |

**MEMORANDUM AND OPINION**

The Official Committee of Unsecured Creditors (the "Committee") appeals the bankruptcy court's order granting Hartree Partners, LP's claim for a $3.3 million breakup fee and $885,506.98 for expense reimbursements after Hartree acted as a "stalking-horse bidder" in an auction of the bankrupt debtors' assets. The Committee seeks reversal and an order directing Hartree to disgorge the breakup fee and expense reimbursement. Based on the briefs, the oral argument, the record, and the applicable case law, the court affirms the bankruptcy court's order and dismisses the appeal.

The reasons are set out below.

**I.     Background**

The Bouchard Transportation Company and its subsidiaries (the "Debtors") are one of the nation's largest independently owned ocean-going petroleum barge companies. After financial

setbacks, including COVID, "the Debtors' operations had ground to a halt," and the Debtors "lacked the liquidity and human capital necessary to perform repairs on their fleet, obtain or reobtain required regulatory and other certifications, and otherwise place vessels back in service." (App'x 473).   In September 2020, the Debtors filed Chapter 11 cases in the bankruptcy court. (*Id.*).

The bankruptcy proceedings got off to a rocky start.   To finance the Chapter 11 cases and restart the business, the Debtors entered into a $60 million postpetition debtor-in-possession financing facility with Hartree, to be paid back with interest and fees.   (App'x 35, 77).   The Debtors quickly defaulted on the facility.   Concerned with the Debtors' conduct and situation, the bankruptcy court removed Morton S. Bouchard, III, from his roles as the Debtors' CEO and director and appointed Matthew Ray of Portage Point Partners, LLC, as the Chief Restructuring Officer.   (App'x 333).   The Debtors then entered into a second debtor-in-possession financing facility for $90 million with JMB Capital Partners Lending, (App'x 346), and used part of that funding to pay off the outstanding principal, interest, expenses, and fees relating to the Hartree facility.   (App'x 445).   The JMB facility was secured by 31 of the Debtors' vessels. (App'x 439–40; Docket Entry No. 32, at 13).

Despite the additional funding, the Debtors' "initial efforts to rehabilitate the business failed." (Docket Entry No. 32, at 9).   The Debtors determined that the only viable option to repay their outstanding debt obligations and to fund their working capital needs was to sell their vessels in an auction.   (App'x 473, 642).   The Debtors, with the assistance of their financial advisor, Jefferies LLC, contacted 165 potential bidders to assess interest in purchasing some or all of the vessels.   (App'x 474).   Of those bidders, seven submitted proposals for purchasing the vessels— six for specific assets, and three for substantially all of the assets.   (*Id.*).   The Debtors then sought

approval from the bankruptcy court to sell the vessels through an auction and proposed bidding procedures for that auction.  (App'x 473).

The bankruptcy court approved the Debtors' proposed bidding procedures.  (App'x 546).  No party objected to the Debtors' proposals or the bankruptcy court's order approving them.  The bid procedures allowed the Debtors to select a "stalking-horse bidder"—a bidder who agrees, before the auction, to bid on the Debtors' assets for a determined price, thereby setting a "floor" at the auction for the sale amount.  (App'x 564).  The bid procedures allowed the Debtors to offer bid protections to the stalking-horse bidder, including a "breakup fee"—a fee paid to the stalking-horse bidder if its bid is not selected at the auction—and "expense reimbursements" to repay the stalking-horse bidder for its "reasonable and documented out-of-pocket fees and expenses."  (*Id.*).  The procedures provided that "the total Bid Protections offered" could "not exceed 3.0% of the cash purchase price contemplated by such Stalking Horse Agreement" and capped the "total Expense Reimbursement" at an amount "to be agreed upon by the Debtors and the applicable Stalking Horse Bidder[.]"  (*Id.*).

The court's order set deadlines that allowed time to designate and select a stalking-horse bidder, and that allowed interested parties an opportunity to object to the bidder and to any bid protections before the auction.  The deadlines were:

- June 25, 2021: deadline to submit stalking-horse bids;

- July 7, 2021: deadline to designate stalking-horse bidders (if any);

- "Three (3) business days following service of the applicable Stalking Horse Notice": deadline to object to the designation of any stalking-horse bidder or grant of bid protections;

- July 16, 2021, at 5:00 p.m.: deadline for qualified bid submissions;

- July 19, 2021, at 10:00 a.m.: Auction Day One (if applicable);

- July 20, 2021, at 10:00 a.m.: Auction Day Two (if applicable); and

- July 21, 2021, at 4:00 p.m.: Sale Objection Deadline.

(App'x 560).

The court's order stated that "[n]o later than one business day after selecting a Stalking Horse Bidder, the debtors shall file with the Court and serve a notice . . . identifying the Stalking Horse Bidder, the material terms of the Stalking Horse Bid . . . and the amount and terms of any Bid Protections offered to the Stalking Horse Bidder." (App'x 564).  The order also provided that "[a]ny objection to the designation of the Stalking Horse Bidder or to the Bid protections set forth in the Stalking Horse Notice and Stalking Horse Agreement . . . shall be filed no later than the date that is three (3) business days after the date of service of the applicable Stalking Horse Notice.  If a timely Stalking Horse Objection is filed, the proposed designation of the Stalking Horse Bidder and Bid Protections . . . shall not be deemed approved unless approved by separate order of the Court." (*Id.*).

A.    **Selection of the Stalking-Horse Bidder**

In the weeks leading up to the auction, the Debtors failed to secure significant interest in the purchase of the vessels.  By the June 25, 2021, deadline for bidders to submit stalking-horse bids, no bidder had emerged.  Richard Morgner, the managing director and joint global head of debt advisory and restructuring at Jefferies, was concerned about having a "naked auction"—an auction without a floor price set by the stalking-horse bidder—because he did not "know[] what the opening bid would be," given the lack of interest in purchasing the vessels.  (App'x 784).  On July 7, 2021, the Debtors, with the Committee's consent, extended the stalking-horse deadline to July 11, 2021, and continued to search for a bidder.  (App'x 588).  No other deadlines were extended.

4

On July 9, 2021, Morgner contacted Scott Levy, a partner at Hartree, to see if Hartree had any interest in serving as a stalking-horse bidder. (App'x 899). Levy "quickly engaged" with the Debtors, beginning the due diligence process and "socializing the idea" of "being the stalking horse bidder" with Hartree's board and senior management. (*Id.*). On July 12, 2021, Levy informed Morgner that Hartree would be interested in making a cash bid as a stalking-horse buyer for the 31 vessels that served as collateral for the JMB Capital financing facility. (*Id.*).

To allow time for negotiations with Hartree over possible bid terms, the Debtors, with the Committee's consent, extended the stalking-horse bidder designation deadline to July 16, 2021, and extended the qualified bid deadline to July 18, 2021. (App'x 592). The auction date was unchanged.

Hartree initially offered to bid $105 million for the vessels. (App'x 792). In negotiations over the next five days, Hartree increased its bid to $107 million, then to $108 million, and finally to $110 million. (*Id.*). The Debtors tried to get Hartree to increase its bid further, but Hartree held firm at $110 million. (*Id.*). Hartree also insisted on receiving bid protections, including a 3% breakup fee and a $1.5 million expense reimbursement. (App'x 792–93). The Debtors tried to negotiate a lower amount, asking for a 2% breakup fee and a $1 million expense reimbursement, but Hartree refused to reduce these bid protections. (App'x 793).

In the week leading up to the auction, the Debtors' board of directors met with financial and legal advisors five times to discuss options related to the vessel sales. The board minutes note that the board entertained Hartree's stalking-horse bid and a separate bid from Centerline Logistics Corporation. No other bidders had emerged. Centerline submitted a bid to purchase all the vessels secured by the JMB Capital facility and 19 additional vessels secured by the Debtors' prepetition revolving-credit facility with Wells Fargo Bank, N.A. (the "Wells Fargo collateral"). (App'x 734).

5

Hartree's bid was only for the vessels secured by the JMB Capital facility.  Centerline conditioned

its bid on the Debtors granting Centerline exclusivity and cancelling the auction.  (*Id.*).  Hartree's

offer had no similar conditions.

By July 16, 2021, the board still had not decided whether to proceed with the auction and

accept Hartree's stalking-horse bid, or to cancel the auction and accept Centerline's bid.  The board

and its advisors "agreed to push the deadline to designate a stalking-horse bidder until July 18 to

keep both options with Hartree and Centerline open as long as possible."  (App'x 725).  The

Debtors filed a notice with the bankruptcy court extending the stalking-horse-designation deadline

to July 18, 2021, at 11:59 p.m., and extending the qualified bid deadline to July 19, 2021, at 12:00

p.m.  The Debtors extended the auction deadline to July 19, 2021, at 3:00 p.m.—the same day as

the qualified bid deadline, and less than 24 hours after the deadline to announce the stalking-horse-

bidder designation.

On July 18, 2021, the board met twice to consider and vote on how to proceed.  The meeting

minutes reflect that the board decided not to proceed with the Centerline bid because "Centerline's

available financing was not transparent enough and the potential for inadequate financing was a

large risk to closing a transaction with Centerline."  (App'x 728; *see also* App'x 730 ("The Board

expressed that the proposal with Centerline was no longer viable due to the lack of guaranteed

financing commitments from Centerline . . . .")).  The board agreed to "sign[] the stalking horse

sale agreement with Hartree in preparation for a robust auction."  (App'x 730).  The Debtors filed

a notice of selection of stalking-horse bidder with the bankruptcy court, identifying Hartree as the

bidder and attaching the agreement.  (App'x 600).  The agreement provided for a $3.3 million

breakup fee equal to 3% of Hartree's $110 million purchase price and an expense reimbursement

of up to $1.5 million.  (App'x 621, 634–35).  The agreement also required other bidders to bid at

least $500,000 more than Hartree's proposed $110 million purchase price plus the breakup fee and expense reimbursement, setting a floor price of $115.3 million.

No party objected to the stalking-horse bid procedures and agreement in the short window before the auction.  The Debtors' extension of the stalking-horse designation deadline effectively eliminated the three-day window for parties to raise objections to the designation and bid protections.  The Debtors did not seek the bankruptcy court's approval of the stalking-horse bid agreement, as required by the bankruptcy court's bidding procedures order.

### B.    The Auction

The auction took place on July 19, 2021.  (App'x 708).  The auction started with bidding on the Wells Fargo collateral of 19 vessels. The bid for the Wells Fargo collateral was a "naked auction," because Hartree's stalking-horse bid did not extend to the Wells Fargo collateral.  The opening and accepted bid was for $130 million.  (App'x 711).

The auction then turned to the 31 vessels serving as JMB Capital's collateral.  The bidding started with Hartree's stalking-horse bid of $110 million.  JMB Capital then bid the minimum amount of $115.3 million.  (App'x 714).  Hartree asked for time to consider making a competing bid for the vessels, but after a brief break during the auction, announced that it would not do so. (*Id.*).  There were no other bids.

JMB Capital's bid of $115.3 million was accepted, with Hartree designated as the "backup bidder."  (App'x 715).  Because JMB Capital outbid Hartree's stalking-horse bid, Hartree became entitled to the breakup fee and expense reimbursements under the stalking-horse agreement.  After Hartree announced that it would not make another bid, Gregg Galardi, counsel for the Committee, announced at the auction that "the Committee d[id] not support either the breakup fee or the expense reimbursement."  (App'x 714).  No other objections were raised.

### C.      The Hearing and Decision on the Committee's Objection

On July 21, 2021, two days after the auction, the Committee filed a formal objection to Hartree's designation as the stalking-horse bidder and to Hartree's request for bid protections. (App'x 647).  The Committee stated that while it had "consented to the extensions of the Stalking Horse Bid Deadline, it . . . was not asked to consent to [and did not] approve the designation of[] Hartree as the Stalking Horse Bidder.  Nor did the Committee consent to or approve the Debtor's decision to offer Hartree the Break-Up Fee or the Expense Reimbursement."  (App'x 652).  The Committee argued that the bankruptcy court should review Hartree's request for a breakup fee and expense reimbursement as an administrative expense under 11 U.S.C. § 503(b) of the bankruptcy code, and that the court should determine whether the Debtors and Hartree had demonstrated that the breakup fee and reimbursement were "actual, necessary cost[s] and expense[s] of preserving the estates."  (App'x 656).  The Committee argued that neither the breakup fee nor the expense reimbursement provided the Debtors' estate with an actual benefit, and that the bankruptcy court should disallow the bid protections.  (App'x 660).

On August 5, 2021, the bankruptcy court entered an order approving the sale of the Debtors' assets to JMB Capital.  (App'x 664).  The order stated that "[o]n the Closing Date, the Debtors shall deposit $4.8 million into a segregated reserve account held by the Debtors in trust for the benefit of Hartree pending a separate hearing before this Court to determine Hartree's entitlement to the Break-Up Fee and Expense Reimbursement, which hearing shall occur on Thursday, August 12th, or as soon as possible thereafter."  (App'x 702–03).

On August 12, 2021, the bankruptcy court held a hearing on the Committee's objection to Hartree's breakup fee and expense reimbursement under the stalking-horse agreement.  (App'x 756).  The court heard five hours of testimony from three witnesses: Richard Morgner, the Debtors'

lead investment banker at Jefferies; Patrick Bartels, the Debtors' independent director; and Scott Levy, Hartree's lead negotiator with respect to the stalking-horse bid.  The three witnesses all testified that the bid protections were necessary to induce Hartree to make the stalking-horse bid.

The bankruptcy court issued a decision on the record after hearing the testimony and arguments.  The court stated that while it would have liked to consider the Committee's objections before the auction, "unforeseen circumstances"—the additional time that the Debtors needed to select a stalking-horse bidder—required the court to consider the objections after the auction had closed.  (App'x 934).  The court stated that it was unclear which standard of review applied to the Committee's objection to the breakup fee and expense reimbursement, the "administrative expense" standard or a more lenient "business judgment" standard.  (App'x 935).  The court found it unnecessary to decide that issue, because the decision was the same under either standard.  The court found that the stalking-horse agreement, including the bid protections, "certainly" achieved a benefit for the estate, and that the Debtors' decision to offer the bid protections to Hartree was "a knowing, intelligent, and thoughtful decision."  (App'x 934, 935).  The court agreed to allow the $3.3 million breakup fee in full, but reduced the cap on expense reimbursement from $1.5 million to $1 million.  (App'x 935).  Hartree ultimately claimed an expense reimbursement of $885,506.98.  (App'x 955).

On August 23, 2021, the bankruptcy court entered a final order stating that "Hartree's claim for payment of the Breakup Fee in an amount equal to $3.3 million . . . as provided in the Stalking Horse Agreement . . . is allowed under section 503 of the Bankruptcy Code."  (App'x 955).  The court also authorized the payment of $885,506.98 in expense reimbursement.  (*Id.*).  The Committee filed a notice of appeal the next day.  (Docket Entry No. 19, at 7).

## II.    The Legal Standard

"Traditional appellate standards" apply to a district court's review of a bankruptcy court's order under 28 U.S.C. § 158(a).  *Stern v. Marshall*, 564 U.S. 462, 475 (2011).  District courts review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *See In re Ahern Enters., Inc.*, 507 F.3d 817, 820 (5th Cir. 2007); *In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003); *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed."  *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 506 (N.D. Tex. 2019) (quoting *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997)).

Hartree argues that an abuse of discretion standard applies to a bankruptcy court's discretionary decision to approve the payment of bid protections under a stalking-horse agreement. (Docket Entry No. 32, at 9); *see Matter of Mendoza*, 111 F.3d 1264, 1270 (5th Cir. 1997) ("[A] discretionary decision. . . must be reviewed under the abuse of discretion standard.").  Some courts have applied an abuse of discretion standard to review a bankruptcy court's decision allowing or disallowing stalking-horse bid protections.  *See, e.g.*, *In re Energy Future Holdings Corp.*, 904 F.3d 298, 312 (3d Cir. 2018); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010); *In re Acis Cap. Mgmt., L.P.*, 604 B.R. at 506.   Under an abuse of discretion standard, a bankruptcy court's decision may be overturned only if the court applied an improper legal standard or based its decisions on findings of fact that were clearly erroneous.  *In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005); *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

The Committee argues that the abuse of discretion standard does not apply because the "appeal involves mixed questions of law and fact subject to *de novo* review."  (Docket Entry No. 34, at 7).  The Committee argues that the "[t]he bankruptcy court first needed to determine what

legal standard to apply—the Administrative Expense Standard or the Business Judgment Standard," and then "needed to determine whether the evidence was sufficient to conclude that the legal standard was met." (*Id.*).  "Here," the Committee argues, "the Bankruptcy Court did not properly apply the applicable legal standard or apply the facts in the record thereto."

The Committee is correct that this appeal presents a "mixed question of law and fact," because the court must "determine whether the historical facts satisfy [a] legal test"—either the administrative expense standard or the business judgment standard.  *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S.Ct. 960, 966 (2018).  However, de novo review is not always required when reviewing mixed questions of law and fact.  "Mixed questions are not all alike. . . .  [S]ome require courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard. . . .  [O]ther mixed questions immerse courts in case-specific factual issues—compelling them to marshal and weigh evidence, make credibility judgments, and otherwise address . . . 'multifarious, fleeting, special, narrow facts that utterly resist generalization.'"  *Id.* (quoting *Pierce v. Underwood*, 487 U.S. 552, 561–62 (1988)).  When a mixed question primarily requires a court to expound on the law, de novo review may be appropriate.  When a mixed question primarily requires a court to decide case-specific factual disputes, "appellate courts should usually review a decision with deference."  *Id.*  "In short, the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work."  *Id.*

This appeal primarily requires this court to examine whether the case-specific facts support approval under either or both standards of review.  The record facts justify the bankruptcy court's approval under either de novo or a more deferential review.  The Committee's objections to the bankruptcy court's order allowing "Hartree's claim for payment of the Breakup Fee in an amount

11

equal to $3.3 million . . . as provided in the Stalking Horse Agreement," and allowing the payment of $885,506.98 in expense reimbursement, are denied.  The appeal is dismissed.

The reasons are explained below.

## III.    Analysis

The Committee argues that this court should overturn the bankruptcy court's order allowing the $3.3 million breakup fee and $1 million expense reimbursement, because the bankruptcy court did not properly apply the administrative expense standard to determine whether the fee and reimbursements were allowable expenses.   The administrative expense standard requires the Debtors to show that the breakup fee and expense reimbursement: (i) arose from a postpetition transaction with the Debtors; (ii) provided an actual benefit to the Debtors' estate; and (iii) was necessary to preserve the Debtors' estate value.  *See* 11 U.S.C. § 503; *Toma Steel Supply, Inc. v. TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1993).  The Committee argues that none of these factors was met and that the "Court should reverse the decision below and direct Hartree to disgorge the Break-Up Fee and Expense Reimbursement."  (Docket Entry No. 19, at 53).

Hartree argues that the business judgment standard, not the administrative expense standard, applies to the bankruptcy court's review of the bid protections.  Hartree notes, however, that the bankruptcy court considered and approved the bid protections under both the business judgment rule and the administrative expense standard.

### A.    The Applicable Standard

The parties dispute whether a debtor's decision to pay a breakup fee and expense reimbursement to a stalking-horse bidder should be reviewed under the business judgment standard or the administrative expense standard.

The business judgment standard applies to transactions governed by 11 U.S.C. § 363. *See In re Acis Cap. Mgmt., L.P.*, 604 B.R. at 520. "Section 363 of the Bankruptcy Code governs the sale, use, or lease or property of the estate, allowing the trustee to sell 'property of the estate,' other than in the ordinary course of business." *PHH Mortg. Corp. v. Johnson*, 563 F. Supp. 3d 627, 632 (S.D. Tex. 2021) (quoting *Matter of VCR I, L.L.C.*, 922 F.3d 323, 326 (5th Cir. 2019)). A sale of an estate's assets "requires notice and a hearing and is subject to court approval and must be supported by an articulated business justification, good business judgment or sound business reasons." *Id.* (quoting *Matter of VCR I, L.L.C.*, 922 F.3d at 326).

The administrative expense standard applies to transactions governed by 11 U.S.C. § 503. "[S]ection 503 of the Bankruptcy Code pertains to entities that have incurred administrative expenses and wish to request payment from the estate. Claims under this section 'generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate.'" *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (quoting *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001)). "[A]dministrative expenses include 'the actual, necessary costs and expenses of preserving the estate including … wages, salaries, and commissions for services rendered after the commencement of the case." *Matter of Whistler Energy II, L.L.C.*, 931 F.3d 432, 441 (5th Cir. 2019) (quoting 11 U.S.C. § 503(b)(1)(A)). "[T]o qualify as an 'actual and necessary cost' under section 503(b)(1)(A)," the administrative expense standard requires that "a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *Id.* (quoting *Jack/Wade Drilling, Inc.*, 258 F.3d at 387).

"Courts use several approaches in evaluating break-up fees. Some courts evaluate breakup fees based on the Debtor's business judgment," and others "treat a break-up fee as an

administrative claim." *In re JW Res., Inc.*, 536 B.R. 193, 195 (Bankr. E.D. Ky. 2015).  The leading

Fifth Circuit decision on bid protections is *In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011).

In *ASARCO*, the debtor decided to sell its most substantial asset in an auction.  *Id.* at 597.  The

debtor's financial advisor identified potential bidders for the asset and invited a "select group of

bidders to . . . conduct additional due diligence relating to [the asset]."  *Id.* at 598.  "That due

diligence would entail highly sophisticated legal analysis—and thus substantial legal costs—and

ASARCO believed it necessary to provide bidders with an incentive to undertake this investment."

*Id.*  The debtor asked the bankruptcy court for an order "under section 363 of the Bankruptcy

Code" allowing it "to reimburse qualified bidders for their due diligence expenses."  *Id.*

 The bankruptcy court authorized the debtor to reimburse qualified bidders for "expenses

incurred in connection with the sale of a substantial asset of the debtor's estate."  *Id.* at 597.  The

court determined that the "reimbursements were proper under the business judgment standard in

section 363(b) of the Bankruptcy Code."  *Id.*  The debtor's parent companies promptly appealed

the reimbursement order.  *Id.*

The appellants argued that the bankruptcy court erred in reviewing the reimbursement

request using the business judgment standard under § 363(b) rather than the administrative expense

standard under § 503(b).  *Id.* at 601.  The appellants relied on two Third Circuit decisions in which

"the court applied section 503(b) and not 363(b) to requests for break-up fees," *In re Reliant*

*Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010), and *In re O'Brien Envtl. Energy, Inc.*, 181

F.3d 527 (3d Cir. 1999).  *See id.* at 602.

In *O'Brien*, the Third Circuit considered whether a bankruptcy court improperly denied a

bidder's request for a breakup fee.  O'Brien, the debtor, decided to sell its assets as part of its

Chapter 11 bankruptcy proceedings.  181 F.3d at 529.  O'Brien entered into a stalking-horse

14

agreement with one of the bidders, Calpine. *Id.* The agreement was "conditioned on the parties' ability to secure the approval by the Bankruptcy Court of a break-up fee of $2 million and expenses up to approximately $2 million to be paid to Calpine under certain circumstances." *Id.* Before the auction, O'Brien filed a motion seeking the bankruptcy court's approval of the agreement, but the bankruptcy court "refused to approve the break-up fee and expense provisions, expressing concern that allowing such fees and expenses would 'perhaps chill or best certainly complicate the competitive bidding process.'" *Id.*

Despite having conditioned its purchase of O'Brien's assets on the bankruptcy court's approval of a breakup fee and expense reimbursement, Calpine "decided to reenter the bidding" at the auction. *Id.* at 530. Calpine was outbid by another company, NRG Energy, Inc. *Id.* Even though Calpine did not succeed in purchasing the assets, and even though the bankruptcy court had previously denied Calpine's request for breakup fees and expense reimbursement, "Calpine filed an Application for Payment of Fees and Expenses Pursuant to 11 U.S.C. § 503(b), seeking a $2 million break-up fee, $2,250,000 in break-up expenses, and interest[.]" *Id.* The bankruptcy court denied the application.

On appeal, Calpine argued that "break-up fees should be permitted where, after careful scrutiny, the court determines that (1) a debtor believes in its business judgment that such fees will benefit the estate, (2) there is no proof of self-dealing, and (3) there is no proof of specific harm to the bankruptcy estate." *Id.* at 533 (quotation marks omitted). The Third Circuit disagreed, concluding that there was no "compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." *Id.* at 535. "In other words," the court stated, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show

that the fees were actually necessary to preserve the value of the estate." *Id.*  The Third Circuit affirmed the bankruptcy court's order denying Calpine's request for a breakup fee and expense reimbursement.

In *ASARCO*, the Fifth Circuit noted that in *O'Brien* and another Third Circuit case, *Reliant*, "the Third Circuit established that section 503 governs an unsuccessful bidder's request for break-up fees."  650 F.3d at 602.  But the Fifth Circuit was "not persuaded that *Reliant* and *O'Brien* [were] apt [when] . . . a debtor requests the authority to reimburse expense fees 'for second-round "qualified bidders" in a multiple stage auction for a very unique and very valuable but possibly worthless asset.'"  *Id.* (citation omitted).  The court "conclude[d] that the business judgment standard is the better fit for assessing ASARCO's reimbursement motion."  *Id.*  The court explained that

> Section 363 addresses the debtor's use of the estate property, and in its motion ASARCO sought authorization to make discretionary use of the estate's funds. Section 503, in contrast, generally applies to third parties that have already incurred expenses in connection to the debtor's estate.  The unsuccessful bidders in *O'Brien* and *Reliant Energy* sought payment for expenses incurred without the court's pre-approval for reimbursement, and thus section 503 was the proper channel for requesting payment.  In ASARCO's case, however, the bankruptcy court issued the Reimbursement Order *before* any potential qualified bidders, including the intervenors, had incurred due diligence and work fees.  In this context, application of the business judgment standard is appropriate.

*Id.* at 602–03 (emphasis added).

*ASARCO*, *O'Brien*, and *Reliant* are relevant, but they are materially different from the facts of this case.  In *O'Brien* and *Reliant*, the debtors asked the bankruptcy court before an auction to authorize them to use certain bid protections at the auction.  *See In re Reliant Energy Channelview LP*, 594 F.3d at 203; *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 529.  In both cases, the bankruptcy courts denied the request for breakup fees in advance of the auction, but the "unsuccessful bidders [still] sought payment for expenses incurred without the court's pre-

approval for reimbursement." *In re ASARCO, L.L.C.*, 650 F.3d at 602.  In *ASARCO*, the court granted the debtor's request to reimburse all qualified bidders for their expenses before the auction took place.

In *ASARCO*, unlike *O'Brien* and *Reliant*, the motion was filed and granted in advance of the auction.  *In re JW Res., Inc.*, 536 B.R. at 195.  Because the parties sought court authorization before bidding began, the business judgment standard applied under § 363.  By contrast, in *O'Brien* and *Reliant*, the stalking-horse bidder sought reimbursement of expenses and a breakup fee after the auction had ended; the court applied the administrative expense standard under § 503.  *See In re ASARCO LLC*, 441 B.R. 813, 828 (S.D. Tex. Aug. 20, 2010) ("Earlier in this case, the Debtor sought, and the Bankruptcy Court granted, the Reimbursement motion.  Thus, *before* the Intervenors here incurred the due diligence and work fees at issue, they did so with the blessing of the bankruptcy court.  In contrast, the failed bidder in *O'Brien* not only failed to obtain a similar such order approving its proposed break-up fee arrangement, but in fact had its motion for [the] same denied.  Having incurred expenses without pre-approval for reimbursement, it had to later seek relief in the form of an administrative expense.").  As one bankruptcy court has noted, "section 363(b) and 363(a) permit *debtors* (or trustees) to take actions for the benefit of the estate *going forward* based on their own *business judgment*. . . .  Section 503(b), by contrast, permits *creditors* (often over debtor objections) to seek allowance of an administrative expense for *past contributions* to an estate under a *substantial contribution* standard.  *In re Mallickrodt PLC*, No. BR 20-12522-JTD, 2022 WL 906458, at *9 (D. Del. Mar. 28, 2022) (emphasis in original).

This case is between *ASARCO* and *O'Brien.*  The debtors sought and obtained authorization to enter into a stalking-horse agreement that contained bid protections *before* the auction.  But the bankruptcy court also required the Debtors to file "[n]o later than one business day after selecting

a Stalking Horse Bidder . . . the amount and terms of any Bid Protections offered to the Stalking Horse Bidder," so that any objections to the bidding agreement could be made.  The order stated that, "[i]f a timely Stalking Horse Objection is filed, the proposed designation of the Stalking Horse Bidder and Bid Protection provided for under such Stalking Horse Agreement shall not be deemed approved unless approved by separate order of the Court." (App'x 520).  If no objection was raised within three days of notice, the stalking-horse agreement would be "deemed approved without further order of the court[.]"  (*Id.*).

Due to the repeated pushback of the deadline to select a stalking-horse bidder, potential objectors had less than 24 hours to object to the stalking-horse bid agreement before auction, instead of the three days contemplated by the bankruptcy court's order.  (App'x 505).  No party sought a revised order from the bankruptcy court on its stalking-horse bidding procedures.  The Committee did not object to the agreement until the auction itself, and the bankruptcy court was unable to hold a hearing on the objection until *after* the auction had ended, and the sale of assets to JMB Capital was approved.  As the bankruptcy court noted:

> With respect to the allowance of the bankruptcy fee and the expense protections, it's an odd position, because the breakup—you know, I gave in a bid procedures order . . . I gave the debtor the ability to designate a stalking horse.  And as opposed to coming—or filing a motion and coming back to the Court before the auction, and giving people an opportunity to object and my making a decision beforehand, I gave the debtor the ability to make that designation without filing a motion.  And I provided for an opportunity, that was negotiated by the Committee, to object to that.

> And because of circumstances that none of us contemplated, we're here post-auction with an objection that, you know, hindsight, different circumstances, we all wish could have been resolved prior to the auction so that people could have reacted to it.  But that's where we find ourselves.

(App'x 934).

Because the bankruptcy court's stalking-horse bid procedures required at least a three-day window for objections before its approval of the stalking-horse bid agreement went into effect, and because there was no three-day window for objections, the bankruptcy court never approved the final stalking-horse agreement before the auction. This suggests, under the court's reasoning in *ASARCO*, that a § 503 administrative expense standard should apply to this court's review of the bid protections. As the Fifth Circuit noted, § 363 of the Bankruptcy Code applies the business judgment standard when the debtor seeks "authorization to make discretionary use of the estate's funds." "Section 503, in contrast, generally applies to third parties that have already incurred expenses to the debtor's estate." Like "[t]he unsuccessful bidders in *O'Brien* and *Reliant Energy*," Hartree sought "payment for expenses incurred without the court's pre-approval for reimbursement, and thus 503 was the proper channel for requesting payment." *In re ASARCO, L.L.C.*, 650 F.3d at 602.

Unlike in *O'Brien* and *Reliant*, however, the bankruptcy court did authorize the Debtors to enter into stalking-horse agreements that provided for the payment of breakup fees and expense reimbursements. In *O'Brien* and *Reliant*, the debtors sought authorization before an auction to pay bid protections to a stalking-horse bidder, if the stalking-horse bidder was unsuccessful at the auction. The bankruptcy courts both denied authorization. In this case, the bankruptcy court generally authorized the Debtors to provide bid protections if the protections offered did not "exceed 3.0% of the cash purchase price contemplated by such Stalking Horse Agreement . . . ." (App'x 520). The Debtors' stalking-horse agreement with Hartree provided for a breakup fee equal to 3% of the cash purchase price. Because the bankruptcy court authorized the Debtors "to make discretionary use of the estate's funds" by entering into a stalking-horse agreement that offered bid protections so long as they met certain criteria, and because the Debtors' stalking-horse

agreement met those criteria, *ASARCO* could also be read to suggest that the stalking-horse agreement be reviewed under the business judgment standard, and not the administrative expense standard.

The unusual facts of this case make it unclear which standard should apply. Ultimately, however, this court need not decide which standard applies—the business judgment standard or the administrative expense standard—because the bankruptcy court determined that both standards were met. This court agrees and affirms.

### B.    The Administrative Expense Standard

A creditor's claim for payment is allowed as an administrative expense when the "claim against the estate . . . arise[s] post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *Matter of Whistler Energy II, L.L.C*, 931 F.3d at 441. A bankruptcy court must "scrutinize claimed expenses for waste and duplication to ensure that expenses were indeed actual and necessary." *Matter of DP Partners Ltd. Partnership*, 106 F.3d 667, 673 (5th Cir. 1997). The court must also "distinguish between expenses incurred in making a substantial contribution to the case and expenses lacking that causal connection, the latter being noncompensible." *Id.* "Necessarily, the bankruptcy court enjoys broad discretion in making these determinations." *Id.* at 673–74.

The Committee argues that the bankruptcy court erred in concluding that the breakup fee and expense reimbursements were compensable administrative expenses. The Committee argues that the Debtors did not carry their burden of showing that the bid protections "(i) arose from a potepetition transaction with the Debtors, (ii) provided an actual benefit to the Debtors' estates, and (iii) was necessary to preserve the Debtors' estates' value." (Docket Entry No. 19, at 24).

The bankruptcy court's oral decision approving the breakup fee and expense reimbursement was short and without in-depth discussion of its factfinding. The court stated:

> So what I've got is, in my mind, a valid challenge to a bid protection that was approved by the debtors, and to which the Committee took an issue. That is a dispute over which I have jurisdiction pursuant to 28 U.S.C. § 1334. It is a core proceeding under 28 U.S.C. § 157. And it is a matter over which I have the ability to enter a final order. . . .
>
> What we are talking about today is the allowance of a claim. And whether you— whatever standard you apply, business judgment or a 503 actual and necessary standard, which I think is the appropriate consideration given where we are—the standard's been met.
>
> There was certainly a benefit that was achieved. And again, you won't convince me—I mean, I've been around way too long. You only bid one more dollar than you have to, and then you go from there. And so I know what I would have done. And I think that I do get to apply common sense, as well as my own experience . . . .
>
> And so I do think that the—I do think that having made a deal, negotiated the amount, I do think that the allowance of the breakup fee as requested is appropriate and I do find that the standard has been met. . . .
>
> With respect to the reimbursement . . . I'm capping you at a million dollars. . . . I want this put to bed. There's not enough money in the case to continue to fight about this. . . . I am allowing you a Chapter 11 administrative claim for the breakup fee in the amount of 3.3 plus the reasonable expenses, capped by a million dollars, so I've got some certainty.

(App'x 934–36).

The court then entered a written order allowing Hartree's claims for a breakup fee and expense reimbursements:

> Hartree's claim for payment of the Breakup Fee in an amount equal to $3.3 million (3% of the amount of the Stalking Horse Bid) as provided in the Stalking Horse Agreement, subject to the terms and conditions set forth therein, in the Bidding Procedures Order, and this Order, is allowed and entitled to administrative expense priority under section 503 of the Bankruptcy Code.
>
> Hartree's claim for Expense Reimbursement is subject to a cap of $1 million; an amount of $885,506.98 of incurred expenses is allowed and entitled to administrative expense priority under section 503 of the Bankruptcy Code.

(App'x 955).

While the bankruptcy court's order makes clear that the court affirmed the bid protections under the administrative expense standard, the decision does not detail the factual basis, other than by stating that "[t]here was certainly a benefit achieved."  The record nonetheless supports the bankruptcy court's decision.

        i.      A Postpetition Transaction

First, the court must assess whether there was a postpetition transaction between Hartree and the Debtors.  An administrative claim must arise from a postpetition transaction with the debtor in possession, "as opposed to the pre-petition debtor." *Whistler Energy*, 931 F.3d at 442.

The Committee argues that "there was no enforceable postpetition transaction supporting payment of the break-up fee and expense reimbursement and administrative expenses," because "the Hartree [asset purchase agreement], together with the Break-Up Fee and Expense Reimbursement contemplated thereunder, were subject to Bankruptcy Court approval." (Docket Entry No. 19, at 34–35).  The bankruptcy court's order stated that a stalking-horse agreement did not become valid until "the expiration of three (3) business days after [the Debtors'] service of the Stalking Horse Notice," or until the court approved the stalking-horse agreement if an objection were raised within "[three] business days after the date of service." (App'x 984).  There was no three-day period for objections, however, because it took longer than anticipated for the Debtors and Hartree to reach a finalized stalking-horse agreement, requiring the Debtors to repeatedly extend the deadline for selecting a stalking-horse bidder.  The Committee argues that the court never approved the Hartree stalking-horse agreement before the auction, and so there was no valid postpetition transaction.

The Committee raised this argument before the bankruptcy court, which stated: "With respect to there [being] no transaction, I'm going to respectfully disagree.  I think the bid procedures gave the debtors an—gave them the right to designate.  It gave other parties the right to object.  That created a contested matter . . . and it's my view that's what I'm resolving today." (App'x 775).

The bankruptcy court's pre-auction order authorized the Debtors to select a stalking-horse bidder and to offer bid protections to that bidder.  (App'x 971).  The Debtors entered into a stalking-horse agreement with Hartree that provided for bid protections.  Hartree, in reliance on the agreement, placed an opening bid at the auction of $110 million.

The bankruptcy court never approved of the final stalking-horse agreement between Hartree and the Debtors, but there is nothing in the bankruptcy code that requires a bankruptcy court to provide an opportunity for parties to object to a stalking-horse agreement before an auction.  Even though the bankruptcy court attempted to provide an opportunity to raise objections before the auction, the Committee consented to the Debtors' extension of the stalking-horse designation deadline, knowing that it would eliminate their three-day window to object.  The Committee still had at least a 12-hour window to object before the auction began, but did not ask the bankruptcy court to delay the auction to allow the Committee time to object to the stalking-horse agreement before the auction, and did not raise any objections until after JMB Capital outbid Hartree at the auction.

Although the bankruptcy court had originally ordered the parties to give enough notice of the stalking-horse agreement for objections, the parties, with the Committee's consent, knowingly waived this opportunity.  (*See* App'x 780 ("[The Committee] did not make any objection.  They did not file any reservation of rights.  They chose to not voice their objection to the bid protections

that were negotiated until the very end of the auction, after the bidding had taken place. . . .  [A]t that point the bid protections had—and the stalking horse [agreement] had served [their] function, the benefit had accrued.")).  The bankruptcy court, in turn, considered objections to the agreement after the auction.  (*See* App'x 934 ("[B]ecause of circumstances that none of us contemplated, we're here post-auction with an objection that, you know, hindsight, different circumstances, we all wish could have been resolved prior to the auction so that people could have reacted to it.  But that's where we find ourselves.")).

The stalking-horse agreement between Hartree and the Debtors was a valid postpetition transaction when the parties entered into the agreement, served notice of the agreement to the bankruptcy court, and then acted on the agreement at the auction by placing a stalking-horse bid. Hartree provided the Debtors with a service—acting as the stalking-horse bidder—and then sought payment for providing that service in the form of the bid protections offered in the stalking-horse agreement.  Whether the bid protections provided an "actual and necessary" benefit to the estate is a different question that the court turns to next.  But there was a postpetition transaction between the Debtors and Hartree.

ii.    "Actual and Necessary Expense"

Hartree must also show that the bid protections "were actual and necessary and that any fees are reasonable."  *Matter of DP Partners Ltd. Partnership*, 106 F.3d at 673.  "Section 503(b)(3)(D) provides that compensable administrative expenses include 'the actual, necessary expenses … incurred by … a creditor in making a substantial contribution in a case under chapter 9 or 11.'  A bankruptcy judge must scrutinize claimed expenses for waste and duplication to ensure that expenses were indeed actual and necessary."  *Id.*  "The claimant seeking administrative expenses bears the burden of proof."  *Matter of Whistler Energy II, L.L.C.*, 931 F.3d at 441.

Bid protections generally are thought to serve several purposes.

[P]rospective purchasers [of a debtor's assets] often ask the debtor to agree to provide certain protections to them for the risks inherent in bidding on assets in a bankruptcy case.  Since the proposed sale is subject to review and approval by other parties in interest and the bankruptcy court, the purchaser wants to be protected from investing significant time and expense in completing its due diligence and making an offer, only to have its offer "topped" or bettered by another purchaser as the notice period runs. . . .  The basic justification for break-up fees is that the initial offeror provides a valuable service by establishing a minimum price for the assets to be sold and in creating a market for the assets.  Proponents of these types of fees argue that without them, no bidder would risk time and money to make the first bid.  Additionally, if the first bidder is assured of at least some return, . . . it will be able to make a higher bid.

*Bidding Incentives*, 2 Norton Bankr. L. & Prac. 3d § 44:28 (2022).

The Committee argues that the bid protections were unnecessary because Hartree's stalking-horse bid did not promote competitive bidding and did not "induce[] the only other bidder, JMB, to [bid] at the Auction." (Docket Entry No. 34, at 18).  The Committee argues that proceeds from the auction would be used to repay JMB Capital's financing facility.  "The Hartree Bid provided a choice for JMB—JMB could (i) decide not to bid, consent to the Hartree Transaction, and receive less than payment in full and take a loss on its loan, (ii) submit an overbid (as it did) and use a credit bid to take its collateral, or (iii) not bid and not consent to the Hartree Transaction and force the Debtors into a chapter 7 liquidation." (Docket Entry No. 19, at 39).  The Committee argues that JMB Capital was going to bid at the auction, even without a stalking-horse bid, because the other options were less favorable.  The Committee also argues that Hartree's stalking-horse bid was illusory because "the Hartree Bid could not have closed absent JMB's consent, which consent the Debtors neither sought nor obtained." (*Id.*, at 20).[1]

---

[1] The terms of the Debtors' financing facility with JMB Capital required the Debtors to seek JMB Capital's written consent before "sell[ing], transfer[ring], leas[ing], encumber[ing], or otherwise dispos[ing] of" the collateral securing the JMB facility.  (App'x 222–23).

These arguments are not persuasive.  The evidence supports that the bid protections were actual and necessary expenses that benefitted the estates.

The bankruptcy court heard from three key witnesses during the hearing on the Committee's objections to the bid protections.  First, the court heard from Richard Morgner, the Debtors' lead investment banker at Jefferies.  Morgner testified that the Debtors' board of directors decided to enter into a stalking-horse agreement because "after months of trying to market the[] assets, [the Board] didn't want to have a naked auction."  (App'x 784).  "As the investment banker," Morgner testified, "I was very concerned about having a naked auction, not knowing what the opening bid would be."  (App'x 784).  Morgner continued,

> I was highly concerned that the opening bid, for example, could be far less than the amount of the DIP claim.[2]  We had received indications of interest for some of the vessels at very low numbers.  We were hoping to have a robust auction whereby we would derive value significantly north of the DIP claim, but we wanted to establish a value that at least satisfied the DIP claim and the maritime liens that came before.

(App'x 786).

Morgner testified that the stalking-horse agreement was valuable because it "established a floor" and required JMB Capital to "overbid" by at least $500,000. (App'x 788, 800, 850 ("[I]t did establish a floor.  As I testified before, we could've had an opening bid at $70 million, and the new DIP lender wouldn't have had to bid as robustly as they did at the auction in comparison to the $70 million for the DIP collateral just to pick it up.")).  Morgner testified that the bid protections were reasonable, (*see* App'x 787 ("3 percent . . . is probably the most common breakup fee afforded to a stalking horse bidder."), and that the Debtors were able to convince Hartree to raise its bid from $105 million to $110 million, (App'x 792).  Morgner also testified that Hartree's bid was contingent on the bid protections, despite Morgner's efforts to negotiate the bid protections

---

[2] The "amount of the DIP claim" is the amount necessary to repay the JMB Capital facility.

26

"for a lower amount."  (App'x 793 (Q: "And it was your understanding that, had you refused to provide the bid protections, that Hartree would not have served as the stalking horse bidder.  Is that correct?  A:  That's absolutely correct, yes.")).  Finally, Morgner testified that JMB Capital "had not submitted a bid" before the Debtors entered into the stalking-horse agreement, and that JMB Capital "had not volunteered as the stalking horse bidder."  (App'x 797).   Morgner also noted that the board "ha[d] [JMB Capital's] support in designating Hartree as the stalking-horse bidder."  (App'x 831, 852).

In sum, Morgner's testimony establishes that:

- there was very little interest in the Debtors' assets, and the board had determined that a naked auction might result in a very low starting bid price, or no bid at all;

- had the naked auction resulted in a low starting price, JMB Capital would not have "had to bid as robustly as [it] did";

- the board had communications with JMB Capital, but JMB Capital never expressed an interest in bidding for the assets, or in placing a starting bid for the assets, before the board entered into the stalking-horse agreement.  Instead, JMB Capital supported designating Hartree as the stalking-horse bidder;

- when JMB Capital did bid at the auction, it had to overbid by at least $500,000 because of the stalking-horse agreement;

- the bid protections were necessary to induce Hartree to act as a stalking-horse bidder and to bid $5 million more than it initially offered; and

- the bid protections offered were standard in the market.

The court also heard testimony from Patrick Bartels, the independent director for the Debtors.  (App'x 856).  Bartels echoed many of Morgner's statements.  Bartels confirmed the concern about "going to the auction without a floor being set."  (App'x 858).  Bartels also confirmed that the bid protections "were essential . . . to sign Hartree . . . to the deal."  (App'x 859–60).  Bartels stated that he "believe[d] that the debtors benefitted from designating Hartree as a stalking horse," because "we d[idn't] know where the auction would've started . . . .  We just

27

wanted to get the auction started because . . . this has been a tough case and having that, not only

the floor but the contract to bid off of was usually . . . something that you see . . . on a more usual

basis in cases like this than just ordinary bankruptcy cases."  (App'x 861; *see also* App'x 891

(noting that if there were not a stalking-horse bid "[w]e might have received a much lower bid")).

Bartels also remarked that "[b]ased on [his] experience," a three-percent breakup fee "was within

market."  (App'x 866).

Bartels also remarked that "the estate benefitted [because] we had an overbid and even the

overbidding included $500,000 more in addition—in excess of the bankruptcy as well as the

expense reimbursement."  (App'x 862).  Bartels noted that before "the execution of the Hartree

[asset protection agreement]," the board had not been told "that JMB intended to bid."  (App'x

871).

Again, as with Morgner, Bartels's testimony reflects that the stalking-horse bid resulted in

a bidding floor that was likely higher than it otherwise would have been; that the estate received

at least $500,000 more than it might otherwise have from JMB Capital; that there was no guarantee

that JMB Capital intended to bid when the Debtors entered into the stalking-horse agreement with

Hartree; and that the bid protections were necessary to induce Hartree to bid and were reasonable.

Finally, the court heard from Scott Levy, one of the partners at Hartree.  (App'x 896).  Levy

testified about the extensive upfront expenses Hartree spent on due diligence in order to be the

stalking-horse bidder, and the reasons why Hartree required the bid protections.  (App'x 900–01).

Hartree had at least fifteen people, external financial advisors, and lawyers reviewing materials

necessary for Hartree to bid.  (App'x 902).  Levy noted that Hartree "felt very strongly that the 3

percent break-up fee was a requirement for us to engage and do all the work we were doing to put

forward the bid and to take the risk of being the stalking horse bidder and providing value to the

debtor."  (App'x 904; *see also* App'x 904–05 ("[W]e thought there was a potential if we went out

there, we would get topped, and it was [a] lot of work that we did.  So I think it was extremely

important to us . . . .")).  Levy stated that Hartree would "absolutely not" have "agreed to sign on

to be the stalking horse" "absent the bid protections."  (App'x 906).

Levy also provided detail about events that occurred on the auction day that might have

impacted bidding.  Levy stated that on the day of the auction, "the price of oil, that day, dropped

from $72 to $56.  It was the largest one-time drop in the price of oil since the beginning of COVID.

[Hartree's] trading deck had lost more money than we were bidding—in that one day than we were

bidding to buy these vessels."  (App'x 909).  For that reason, Hartree chose not to bid again after

JMB Capital topped Hartree's bid.  (*See* App'x 909 ("We had a very short period of time to make

a decision.  We had just gotten the numbers of how much money we'd lost on the trading deck,

and, you know, there was five minutes of heavy debate that we had internally.")).

Levy's testimony supports other testimony in the record that the bid protections were

necessary to induce Hartree to bid because of its due diligence expenses.  Levy's testimony also

suggests that the significant drop in oil prices may have impacted potential bidders on the day of

the auction, which could have resulted in a much lower starting bid than if Hartree's bid had not

established the floor.

The Committee does not dispute that the auction ended in success with JMB Capital's bid

of $115.3 million.  As the Debtors stated in closing arguments to the bankruptcy court, "the debtors

received an overbid from JMB that provided significantly more value to the debtors' estates" than

Hartree's bid.  "Not only did the JMB include a $500,000 overbid, but JMB also assured . . . three

Unico contracts that Hartree was planning to reject, which could have resulted in millions of dollars

of administrative claims against the debtors' estates."  (App'x 920).  JMB Capital also "offered

employment contracts to all 31 mariners on the JMB-acquired vessels. They agreed to a prohibition of post-closing activities that could increase the debtors' tax liabilities. They agreed to assume certain warrant obligations. And they also agreed to reimburse the debtors for certain prepaid expenses." (App'x 920–21).

The Committee argues that the auction would have ended in the same level of success even without Hartree's bid. The record evidence does not support the Committee's argument. The board had no indications that JMB Capital would bid at the auction at the time that it entered into a stalking-horse bid agreement with Hartree. If JMB Capital always intended to bid $115.3 million, as the Committee argues, then it does not make sense that JMB Capital would have supported the Debtors' decision to enter into a stalking-horse agreement with Hartree, instead of JMB Capital itself choosing to be the stalking-horse bidder, avoiding the need to cover the bid protections to Hartree. The board faced the very real possibility that there would be no bidders, or bids substantially lower than Hartree's.[3] Hartree would not enter into the asset purchase agreement with the Debtors absent the bid protections, and the bid protections incentivized Hartree to conduct due diligence and ultimately bid $5 million more than initially offered. *See O'Brien*, 181 F.3d at 535 (noting that bid protections are not necessary when "a potential purchaser [would] bid whether or not break-up fees are offered").

Because of Hartree's stalking-horse bid, JMB Capital bid at least $500,000 more than it might otherwise have. (*See* App'x 935 ("You only bid one more dollar than you have to.")). The stalking-horse bid had an intended effect in that JMB Capital bid the precise amount necessary to

---

[3] Had there been no bids at the auction, JMB Capital would have "foreclose[d] on its collateral outside of the sale process," which would have led "to a host of other undesirable consequences: the administrative insolvency of Debtors' estates, the conversion of Debtors' cases to Chapter 7, and the potential for costly and uncertain litigation among parties in interest." (Docket Entry No. 31, at 9).

outbid Hartree.  (*See* App'x 714 ("We bid $115.3 minimum over bid.  It's the DIP obligations plus cash to cover the 115.3.").  This is sufficient to show an "actual and necessary expense."

The bankruptcy court properly concluded that "a benefit . . . was achieved" by the bid protections, and that the bid protections were reasonable.  Hartree was entitled to payment of the breakup fee and expense reimbursements under the administrative expense standard.

### C.     The Business Judgment Standard

The bankruptcy court also allowed the bid protections under the more flexible "business judgment standard."  "The business judgment standard in section 363 is flexible and encourages discretion.  *ASARCO*, 650 F.3d 593, 601 (5th Cir. 2011).  "Whether the proffered business judgment is sufficient depends on the case." *In re Cont'l Air Lines, Inc.*, 780 F.2d 1123, 1126 (5th Cir. 1986).  "[T]he bankruptcy judge 'should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors, and equity holders alike.'" *Id.* (quoting *In re Lionel Corp.*, 772 F.2d 1063, 1071 (2d Cir. 1983)).  In assessing breakup fees under the business judgment standard, courts have asked:

(1) Is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation?

(2) Does the fee hamper, rather than encourage, bidding?

(3) Is the amount of the fee unreasonable to the proposed purchase price?

*See ASARCO*, 441 B.R. at 826 (quoting *In re Integrated Res., Inc.*, 147 B.R. at 657).

The bankruptcy court considered whether to approve the bid protections under the business judgment standard, stating:

This has been an unusual case.  It has required people to get outside the normal playbook and to make decisions based upon incomplete information, and ever-changing information. . . .  The speed at which things were changing and significant events were occurring, doesn't happen in every case.  If Mr. Morgner took a—or made a strategic decision in an effort to achieve what he believed to be a good result

for the estate, then my hat's off to him.  That's not something he should be criticized for.  It's something he should be complimented for.  And so I don't have any issues at all with the activities that Mr. Morgner undertook, or . . . the communications that went back and forth with the debtor.

I think that Mr. Ray and Mr. Bartels made the best possible decision they could have under the circumstances.  It was a knowing decision.  It was a thoughtful decision.  And I don't have to get to the point of whether it was right or wrong.  They made the best decision they could under the circumstances.  They availed themselves of the available information.

I mean, assets are worth what assets are worth.  And that's all you can deal with.  And so to the extent—and I do think that their decision to enter into the agreement is one that is measured by business judgment.  The business judgment has been challenged.  I will specifically find that Mr. Morgner and Jefferies and Mr. Ray and Mr. Bartels, specifically, at all times, prudently exercised business judgment and made knowing, intelligent, and thoughtful decisions.

Again, they don't have to be right.  And I'm not saying that they're wrong.  But the standard is never that they have to be right.  It just has to be a knowing, intelligent, and thoughtful decision; and the record is more than sufficient to reach that conclusion.

(App'x 932–34).

The Committee does not dispute that it was in the best interest of the Debtors' estates to have an auction for the sale of some or all of its assets.  The Committee takes issue only with the manner in which the Debtors conducted the auction.  The Committee argues that, even if the business judgment standard applies, the board should not have entered into the stalking-horse agreement, and by doing so, "failed to discharge the duty of care and their obligation to safeguard the interests of unsecured creditors."  (Docket Entry No. 19, at 50).

The record does not support this argument.  The record shows that the board was thorough in trying to secure the highest possible bids at the auction.  The Debtors first engaged an investment bank, which "contacted 165 potential bidders," and "executed confidentiality agreements" with 73 bidders to "provide[] [them with] access to a virtual dataroom containing detailed information about the Debtors' industry, business, and assets."  (App'x 474; *see also* Supp. App'x 15 ("This

32

market outreach . . . has been to private equity firms that include traditional banks, include alternative lenders, typically maritime specialized firms . . . and of course, we reached out to strategic acquires up and down the East Coast, across the Gulf, and located on the West Coast of the United States.")).  "Interested parties were invited to participate in further discussions with Jefferies regarding the Debtors' industry, business, and assets, the facts and circumstances of these chapter 11 cases, and [the] bidding process."  (App'x 474).  Ultimately, "Jefferies received 9 written indications of interest from 7 parties," only three of which "were for substantially all of the Debtors' assets."  (*Id.*).

Due to the low amount of interest, the Debtors sought the bankruptcy court's permission to "execute one or more Stalking Horse Agreements . . . if doing so [would] maximize the value received for their assets," and asked to "hold an Auction . . . to determine the highest or otherwise best bid (or bids)."  (App'x 475).  The bankruptcy court granted the Debtors' permission "to select one or more bidders to act as Stalking Horse Bidders" and "to offer . . . Bid Protections to such Stalking Horse Bidder(s)."  (App'x 507).

The Debtors then contacted Hartree to see if it would serve as a stalking-horse bidder.  The record shows that the Debtors and Hartree engaged in substantial negotiations, which resulted in Hartree increasing its bid from $105 to $110 million.  (App'x 792).

The board, however, did not immediately accept Hartree's offer.  In the week leading up to the auction, the board of directors met five times to discuss options related to the sale of the Debtors' assets.  (App'x 720–30).  The board discussed both Hartree's proposal and the Centerline proposal, and the board minutes reflect "discussion[s] . .  on what would be the most value maximizing opportunity for the Company."  (App'x 722).  The board extended deadlines to announce a stalking-horse bidder, with the Committee's approval, to entertain all available options.

On July 18, 2021, the board met twice and heard a presentation prepared by Kirkland & Ellis.  The presentation notes that "Jefferies ha[d] . . . spearheaded a robust marketing process to identify potential bidders for some or substantially all of the assets of Bouchard Transportation Co., Inc. and its debtor subsidiaries."  (App'x 734).  The presentation weighed the pros and cons of proceeding with the Centerline bid or the Hartree stalking-horse agreement.

The Committee argues that "[t]he July 18 Board Meetings at which the decision to proceed with Hartree as the Stalking Horse bidder lasted a total 40 minutes, which simply was not enough time for the Board to carefully review the 23-page detailed Board presentation."  (Docket Entry No. 19, at 51).  But board members had already met and discussed the Hartree bid numerous times that week; board members had an opportunity to review the presentation before the board meeting; and board members had time between the two board meetings that day to review the presentation.  (App'x 881).  There is no basis to conclude that the board did not thoroughly review the presentation and make a well-reasoned, careful decision to designate Hartree as the stalking-horse bidder.

The bid protections offered to Hartree were reasonable and authorized by the bankruptcy court.  The bid protections were no higher than 3.0% of the purchase price, and the total expense reimbursement was capped at 1.5 million, which the bankruptcy court subsequently lowered.  (App'x 564).  Testimony before the bankruptcy court revealed that the bid protections offered were standard.

The record is clear that the board acted in good faith, that it acted in the best interest of the estates, and that it reasonably believed that a stalking-horse bid was necessary for a successful auction, particularly given the demonstrated low interest in bidding.  The board had few options going into the auction other than to accept Hartree's stalking-horse bid of $110 million, and none

more attractive.   The bid protections were a necessary component of the agreement.   The protections became even more important given the oil-price drop on the auction date, a change that was out of the board's control and may have affected the auction.   There is no record evidence to suggest that the board acted in self-interest, or that the bid protections were unreasonably high. The bankruptcy court properly upheld the bid protections under the business judgment standard. *See In re Integrated Res., Inc.*, 147 B.R. at 658 ("A bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations.").

## IV.    Conclusion

The bankruptcy court's Order Allowing Hartree Capital LP's Claims, (Bankr. Dkt. Entry No. 1285), is affirmed.   This appeal is dismissed.

SIGNED on May 31, 2022, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

35